UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CRIMINAL NO. |
| | ) | |
| v. | ) | VIOLATION:  18 U.S.C. § 371 |
| | ) | (Conspiracy to Commit Bribery) |
| | ) | |
| RANDY ALFORD, | ) | |
| | ) | |
| Defendant. | ) | |

STATEMENT OF THE OFFENSE

Pursuant to Federal Rule of Criminal Procedure 11, the United States, by and through its undersigned attorneys, and defendant RANDY ALFORD ("ALFORD"), with the concurrence of his attorney, Michelle Peterson, stipulate and agree that the following facts fairly and accurately describe ALFORD's conduct in the offense to which he is pleading guilty.  These facts do not constitute all of the facts known to the parties concerning the charged offense and related conduct. This statement is being submitted to demonstrate that sufficient facts exist to establish that ALFORD committed the offense to which he is pleading guilty.  ALFORD knowingly, voluntarily, and truthfully admits to the facts set forth below:

1.     From in or around October 2006 until in or around December 2017, defendant RANDY ALFORD ("ALFORD") was a Marine Liaison Officer for the U.S. Navy's Fifth Fleet in Manama, Bahrain, from in around October 2006 until in or around December 2017.  ALFORD had the following official duties, among others, as the Marine Liaison Officer in Bahrain:

-   *Coordinates as Dock Master Position of the vessels, ensuring timely, proper and adequate services. Coordinates/arranges Diplomatic clearances through the U.S. Embassy for all U.S and Coalitions vessels entering Bahrain coastal waters.*

-   *Monitor efficiency and effective use of Mina Salman pier assets in the area of*

1

*responsibility. Recommends changes to NSA Bahrain for proper validation.*

- *Audit and certifies U.S. and coalition vessels Service's through deal bills and invoices. Ensures invoices match services provided. Coordinates with comptrollers to ensure timely and accurate payments.*

- *Compiles and submits monthly, quarterly and annual reports to Commander, Navy Region Europe, Africa, Southwest Asia, NSA Bahrain Port Operational Department, Bahrain Port Control, Bahrain Port Authority and The U.S Embassy as required.*

2.      From in or around December 2017 until in or around July 2020, ALFORD was a civilian Transportation Specialist for the U.S. Army at Fort Rucker, Alabama.  As a Transportation Specialist, ALFORD was responsible for ordering trucking and other logistics shipments to and from Fort Rucker.  In or around July 2020, ALFORD returned to his position with the Navy in Bahrain as a Marine Liaison Officer.

3.      ALFORD was at all times a civilian employee of the U.S. Navy and U.S. Army, and was a "public official" within the definition of Title 18, United States Code, Section 201(a)(1). During his employment with the Navy, port visits and the supervision of ship husbanding services in Bahrain were matters within ALFORD's official duties.  ALFORD engaged in official acts to benefit MLS during his employment in Bahrain.

4.      Frank Rafaraci ("Rafaraci") was a United States citizen.  Rafaraci was the Chief Executive Officer and Chief Operating Officer of Multinational Logistic Services ("MLS"), a multi-national corporation with headquarters in Malta.  As of March 2021, MLS had operating locations in countries across the globe, including the United Kingdom, United Arab Emirates, Singapore, and the United States.

5.      MLS's primary business was "ship husbanding", which is the coordination,

2

scheduling, and direct and indirect procurement of items and services required by ships when they arrived into port. MLS provided ship husbanding services to the United States Navy, as well as to other allied navies around the world.

6.      Thomas Rafaraci was a United States citizen and was the Chairman of the Board of Directors for MLS. Thomas Rafaraci was Frank Rafaraci's brother.

7.      From at least in or around 2013 through in or around 2021, ALFORD knowingly conspired and agreed with Frank Rafaraci, Thomas Rafaraci, MLS, and others known and unknown, to commit bribery; namely, ALFORD, being a public official, directly and indirectly, corruptly demanded, sought, received, accepted, and agreed to receive and accept things of value, in return for being influenced in the performance of official acts.

8.      As detailed further below, ALFORD accepted cash and entertainment expenses, in return for being corruptly influenced in the performance of his official acts and aiding in committing fraud on the United States by, among other things, providing MLS with internal government information about U.S. Navy ship and inspection schedules, in violation of his obligation not to provide this information; influencing where U.S. and allied warships made port calls in Bahrain, to the benefit of MLS; approving or failing to inspect improper and fraudulent expenditures by MLS; advocating for positions that helped MLS in the Navy's discussions with Bahraini port authorities; and otherwise used his position and influence in the U.S. Navy to advocate for and advance MLS's interests, to the benefit of MLS and to the detriment of MLS's competitors and the U.S. Navy, as opportunities arose.

9.      As part of the conspiracy, and in order to conceal the payments and the nature of the corrupt agreement among the members of the conspiracy, ALFORD and his co-conspirators used coded language and other means to describe bribery payments. This included, but was not

limited to, referring to bribe payments as "loans," which were never intended to be repaid, and were in fact never repaid, splitting the bribe payments into smaller cash deposits that would not be reported as currency transactions by ALFORD's bank, and limiting traceable communications related to the bribe payments and connected official acts.

10.     On or about February 27, 2013, ALFORD, using his official Navy email account, wrote to an MLS employee with the initials "KW" an email with the subject line "SHIP MOVEMENT."  KW replied, "Sir, Will we be able to access shed B today…".

11.     On or about March 4, 2013, ALFORD provided information to KW regarding visiting British warships to Bahrain, which was proprietary information belonging to the United States Navy.  MLS also had the husbanding contract for the British Royal Navy, which was an important allied navy and involved in joint military operations with the United States in the region, at this time.

12.     In or around March and April 2013, ALFORD exchanged multiple emails with KW at MLS and various officers from the British Royal Navy regarding the use, plans, and layout of "Shed B", a storage location located in the part of the Mina Salman Port controlled by the U.S. Navy.  Throughout these email exchanges, ALFORD weighed in regarding the U.S. Navy's position on the use of the shed by MLS in its service of the British Royal Navy.

13.     On or about March 20, 2013, a British Royal Navy officer wrote to an MLS employee, with ALFORD cc'd, asking, "during a routine visit to Shed B today it transpires that the US is planning to demolish it at the end of the year?  While this came from a low-level source, it is something I suggest we need to clarify as soon as possible."

14.     On or about March 21, 2013, the MLS employee responded, "We shall clarify this with Randy tomorrow".  KW then forwarded the message to ALFORD, writing "Sir please pass

this on and let me know as soon as possible."

15.     On or about April 4, 2013, ALFORD sent a scanned copy of the British Royal Navy's plan for the layout of the shed to various U.S. military officials and KW.

16.     On or about July 11, 2015, ALFORD solicited a bribe from MLS.  ALFORD sent an email to Thomas Rafaraci's MLS email account with the subject line "Money".  The email said, "Hello, Hope this e-mail finds you and your family in good health and spirit.  Can I please make a loan out to you for $20,000?"

17.     In or around August 2015, after this email exchange, ALFORD met Frank Rafaraci in the Diplomat Hotel in Manama, Bahrain.  Rafaraci gave ALFORD an envelope with $20,000 in cash.  Rafaraci told ALFORD to keep up the good work and that he'd be in touch with ALFORD.

18.     From on or about August 31 until on or about September 6, 2015, the *U.S.S. Theodore Roosevelt*, a Navy ship, made a port call to Khalifa Bin Salman Port in Bahrain.  MLS was the husbanding service provider.  The total cost to the United States was $478,259.71. ALFORD oversaw and was responsible for managing aspects of the *Theodore Roosevelt*'s port visit.

19.     On or about September 14, 2015, ALFORD deposited $1,300 in cash into an account at Navy Federal Credit Union controlled by ALFORD.  This deposit, like others, was designed to conceal the fact that ALFORD was depositing bribe payments from Rafaraci.

20.     On or about October 2, 2015, ALFORD deposited $1,500 in cash into an account at Navy Federal Credit Union controlled by ALFORD.

21.     On or about November 22, 2015, ALFORD deposited $500 in cash into an account at Navy Federal Credit Union controlled by ALFORD.

22.     On or about December 10, 2015, ALFORD deposited $1,060 in cash into an

account at Navy Federal Credit Union controlled by ALFORD.

23.     On or about December 23, 2015, ALFORD deposited $1,000 in cash into an account at Navy Federal Credit Union controlled by ALFORD.

24.     On or about March 22, 2016, the U.S. Navy issued contract N40339-16-P-B014 to MLS for $148,999.98.   The scope of work for this contract was to provide labor, materials, equipment, transportation, supervision, and other related work necessary to provide a barge at Naval Support Activity Bahrain, Mina Salman Port, from March 23, 2016 through June 22, 2016. The Operational Port Security point of contact listed in this contract was Randy ALFORD.  In this role, ALFORD directly oversaw aspects of MLS's performance on this contract.

25.     On or about June 16, 2016, the U.S. Navy issued contract N40339-16-P-B026 to MLS for $297,999.96 for renting barges at Mina Salman pier, Naval Support Activity Bahrain. The period of performance of this contract was June 23, 2016 through December 22, 2016, and was extendable for an additional six months.  The Operational Port Security point of contact listed in this contract was Randy ALFORD.  In this role, ALFORD directly oversaw aspects of MLS's performance on this contract.

26.     On or about November 30, 2016, ALFORD deposited $1,150 in bribes into an account at Navy Federal Credit Union controlled by ALFORD.

27.     On or about May 17, 2017, ALFORD solicited further bribe payments by sending an email to Thomas Rafaraci, saying, "Hello!  How are you, Frank, and the family.  I wanna talk to you.  Please keep in touch."

28.     In the weeks following, Frank Rafaraci and ALFORD met in person again.

29.     On or about or about May 19, 2017, ALFORD deposited $800 in bribes into an account at Navy Federal Credit Union controlled by ALFORD.

30.     On or about September 6, 2017, ALFORD notified the *U.S.S. Thunderbolt* that it would have to change berths at Mina Salman Port in Bahrain.  By requiring the *Thunderbolt* to change berths, the U.S. Navy had to then pay MLS for the use of tugboats.

31.     On or about September 6, 2017, MLS submitted via email a quote for stevedoring services to ALFORD, addressed to Port Operations, ALFORD's department.  ALFORD forwarded the quote to the Navy's contracting department.  MLS submitted a revised quote the following day to the U.S. Navy, and the quote was directed to "Mr. Randy Alford".

32.     On or about September 28, 2017, Port Operations, ALFORD's department, advised the *U.S.S. Lewis B. Puller* to report to an anchorage position outside Mina Salman port.  This anchorage position mandated the order of water taxis from MLS for the ship's port visit to transport the ship's crew to shore, thus benefitting MLS financially.  Mina Salman commercial port was not available at the time that the *Puller* chose to go to anchorage to wait for its berth.

33.     On or about October 22, 2017, the *U.S.N.S. Yukon* disputed a charge from MLS pursuant to its recent visit to Khalifa Bin Salman Port, Bahrain.  Contracting personnel from the Military Sealift Command, the parent organization for the *Yukon*, claimed that it was overbilled by the Port for "port dues," as the Port used a much higher figure for the ship's displacement than was accurate.  The Port obtained this information from Port Operations, ALFORD's department.  The Navy paid the full amount of the overbilling.

34.     On or about October 15, 2017, Port Operations advised the *U.S.N.S. Catawba* it must shift berths in Mina Salman Pier.  ALFORD was cc'd on an email from the *Catawba*'s Supply Officer telling the Navy contracting department that the ship would need the additional services of line handlers and 8 hours of crane service to shift piers.  ALFORD was the primary government point of contact for shifting ships' berthing.  The Navy contracted with MLS to provide these

services.  The *Catawba* was underway for a SMART inspection.

35.     On or about October 31, 2017, Port Operations advised the *U.S.S. Vella Gulf*, it must shift pier berths at Khalifa Bin Salman Port, which required the use of two tug boats and one pilot boat.  This may have been the result of commercial shipping considerations.  As a result of this berth shift, one of ALFORD's responsibilities as a Marine Liaison Officer, the Navy ordered the boats from MLS.

36.     After leaving Bahrain in 2017, ALFORD intended to return to the Navy, and ideally to Bahrain, at some point in the future, and informed others, including Frank Rafaraci, of this intention.

37.     On or about March 27, 2018, ALFORD wrote an email to Thomas Rafaraci, stating:

*Hello Thomas,*

*It's been a awhile how you've been, I wanted to ask for your help again, if possible. I need to barrow [sic] $13,500, my wife need emergency surgery cause me to fallen behind my young son college tuition. I will pay you as soon as possible. [sic]*

*We really appreciate your help and thank you so much.*

38.     On or about April 20, 2018, ALFORD wrote an email to Frank Rafaraci, stating "Frank, please call me."   Rafaraci replied the following day that he was traveling in Asia and would call ALFORD upon his return to Dubai.

39.     On or about May 6, 2018, ALFORD met Rafaraci in a hotel in Miami, Florida. During this meeting, in which Rafaraci paid for drinks, Rafaraci gave ALFORD an envelope containing $13,500 in cash.

40.     On or about May 7, 2018, ALFORD deposited $1,000 in bribe proceeds to ALFORD's bank account, and another $7,000 in cash into two accounts controlled by ALFORD.

41.     On or about May 11, 2018, ALFORD deposited $4,800 in bribe proceeds into a

bank account controlled by ALFORD.

42.     From in or around 2013 to 2021, ALFORD was present and oversaw port visits in Bahrain awarded to MLS with a total value of over $100 million.

43.     ALFORD acted corruptly and with the intent to be influenced in connection with official acts as a public official.

Respectfully submitted,

DANIEL S. KAHN
Acting Chief, Fraud Section
Criminal Division
United States Department of Justice

By:
_____/s/ Justin Weitz_____
Brian Young, Deputy Chief
Justin Weitz, Principal Assistant Chief
Michael P. McCarthy, D.C. Bar #1020231
Criminal Division, Fraud Section
United States Department of Justice
1400 New York Avenue, N.W.
Bond Building, Fourth Floor
Washington, D.C. 20530
(202) 598-8084 (Weitz)
Justin.Weitz@Usdoj.gov

## DEFENDANT'S ACCEPTANCE

The preceding Statement of the Offense is a summary, made for the purpose of providing the Court with a factual basis for my guilty plea to the charge against me.  It does not include all of the facts known to me regarding this offense.  I make this statement knowingly and voluntarily and because I am, in fact, guilty of the crime charged.  No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this Statement of the Offense fully.

I have read every word of this Statement of the Offense or have had it read to me.  Pursuant to Federal Rule of Criminal Procedure 11, after consulting with my attorney, I agree and stipulate to this Statement of the Offense, and declare under penalty of perjury that it is true and correct.

Date: 07 MAY 2021

Randy Alford
Defendant

## ATTORNEY'S ACKNOWLEDGMENT

I have read this Statement of the Offense, and have reviewed it fully with my client. I concur in my client's desire to adopt and stipulate to this Statement of the Offense as true and accurate.

Date:   5/7/2021

Michelle Peterson, Esq.
Counsel for Randy Alford

10